IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2004

## STATE OF TENNESSEE v.  TIMMIE DARRELL BOSTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-D-2391     J. Randall Wyatt, Jr., Judge**

---

**No. M2003-03069-CCA-R3-CD - Filed January 28, 2005**

---

This is a direct appeal as of right from convictions on a jury verdict of rape of a child and assault. The Defendant, Timmie D. Boston, was sentenced as a Range I offender to twenty years' imprisonment for the rape conviction and six months for assault, with the two sentences to be served concurrently.  The Defendant argues two issues on appeal: (1) that the evidence was insufficient to find the Defendant guilty of rape of a child, and (2) that the trial court erred in imposing a mid-range sentence.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Emma Rae Tennant (on appeal); and Elizabeth P. Ezell and Amy D. Harwell (at trial), Nashville, Tennessee, for the appellant, Timmie Darrell Boston.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION
FACTS

The convictions at issue stem from two separate incidents wherein the Defendant sexually confronted the seven-year-old victim, C. C.,[1] in her own home in Nashville.  At the time, the victim lived with her mother, grandmother and several siblings in a house on Stockell Street.  The Defendant, who had once worked with and dated the victim's mother, was considered a family friend

---

[1]It is the policy of this Court to identify victims in child sex offenses only by their initials.

and frequently visited their home. The victim and her siblings also spent time at the Defendant's house, and he occasionally babysat for the family at both locations. For several days during the month of February in 2002, the Defendant was ill and had been invited to stay with the victim's family at their Stockell Street residence.

We first review the facts from the evidence presented at trial, in the light most favorable to the State. On the evening of February 14, 2002, the victim went to sleep with her grandmother about 10:30 p.m. Sometime after midnight, the Defendant entered the bedroom and penetrated the victim's genitals and anus with his finger. The victim immediately woke up, screamed, "fell on" her grandmother to wake her, and stated that the Defendant had "touched" her. The grandmother observed the Defendant standing in her bedroom and asked him to leave. The Defendant complied, and the victim and her grandmother went back to sleep.

Later that morning the victim got up and went to school. The Defendant remained at the house and assisted the victim's grandmother with household chores, all the while muttering audibly that he "messed up." When the victim returned home from school, she reported to her grandmother that she had difficulty urinating and it "burned" when she tried. Members of the victim's family accused the defendant of rape, an altercation broke out, and the police were called. The Defendant was subsequently arrested and indicted for two charges stemming from this incident.

Further investigation revealed prior sexual contact between the Defendant and the victim, and a superceding indictment was issued in December of 2002, charging the Defendant with three counts of rape of a child[2] and four counts of aggravated sexual battery.[3] At his arraignment, the Defendant pled not guilty to all seven charges.

A jury trial was held over the course of two days in June of 2003. At trial, the victim described the events of the February 15, 2002, incident by stating that she was asleep in her grandmother's bedroom when the Defendant came in and "stick [sic] his fingers up my behind."[4] When asked to identify where she had been touched by the Defendant, the victim identified the buttocks region on a diagram of a female body. The victim also testified that she was not wearing underpants at the time, and when asked initially if the Defendant had touched her anywhere else other than her behind, she replied, "no." However, when asked about the events the following day when she returned from school, the victim stated that her "private part hurt" because the Defendant

---

[2] See Tenn. Code Ann. § 39-13-522. Count one related to the February 15, 2002, incident, and counts two and three charged the Defendant with "unlawful sexual penetration" of the victim between the dates of October 24, 2000, and February 14, 2002.

[3] See Tenn. Code Ann. § 39-13-504. Counts four through seven alleged the Defendant "intentionally engaged in unlawful sexual contact" with the victim between the dates of October 24, 2000, and February 14, 2002.

[4] According to the State's election of offenses this testimony formed the basis for count one, in which the Defendant was charged with rape of a child. The Defendant was found guilty on this count.

"would sticking [sic] his finger up my behind." When asked to identify what she had termed her "private part," the victim circled the genital region on a diagram of the female body.

The victim also testified that the Defendant touched her inappropriately on other occasions prior to the February 15, 2002, incident. The victim stated that on one occasion, after she had taken a bath at the Defendant's house, he took her to his bed and "rubbed" her genitals.[5] The victim also described another occasion at the Defendant's house when he "hunched" her on the couch in the front room.[6] The victim described "hunching" as when she laid on the couch, fully clothed, and the Defendant, also fully clothed, laid on top of her in a manner in which their genitals were positioned over one another, and the Defendant moved backwards and forwards in that position. She further stated that the Defendant had shown her "nasty" movies at his house which depicted naked men and women "hunching," and that the Defendant took pictures of her "private part." The victim also testified about other incidents which had occurred in her house, stating that the Defendant "tied my arms up . . . [a]nd then he took my underwear off and tried to put 'em in my mouth." Describing yet another incident, the victim stated that the Defendant put her on the couch in her living room and "lick[ed] my private parts."[7] The victim also stated that the Defendant "showed me his thing." When asked to describe "his thing," the victim pointed to the genital region of a male doll.

On cross-examination, the defense questioned the victim as to inconsistencies between what she told instigators shortly after the Defendant's arrest and her testimony at trial. The victim admitted several times to changing her mind. Contrary to her testimony at trial, she had originally stated to one investigator that the Defendant had not touched her prior to the February 15th incident, and that she was wearing panties during the grandmother's bedroom incident. The victim also admitted that she was never in her house alone with the Defendant, and that no one else ever saw him touch her in a bad way.

The victim's grandmother, Ms. Annie Clack, testified at trial that she woke up in the early morning hours of February 15, 2002, when the victim fell on her. She stated that the victim screamed "[H]e touched me," and she saw the Defendant standing by the victim's side of the bed in her bedroom. After asking the Defendant to leave, she held the victim in her arms to comfort her. Ms. Clack further testified that she remembered the victim was wearing underpants because she felt them when she was holding her. Ms. Clack also testified that the next morning the Defendant "constantly repeated, I messed up. I messed up. I don't know what's wrong with me. I messed up."

---

[5]According to the State's election of offenses, this testimony formed the basis for count four, in which the Defendant was charged with aggravated sexual battery. The Defendant was acquitted on this count by jury verdict.

[6]According to the State's election of offenses, this testimony formed the basis for count five, in which the Defendant was charged with aggravated sexual battery. The Defendant was convicted of the lesser-included charge of assault with offensive or provocative contact.

[7]According to the State's election of offenses, this testimony formed the basis of count 2, in which the Defendant was charged with rape of a child. The Defendant was acquitted on this count.

When the victim came home from school and described the pain in her genital area, Ms. Clack stated that she put "two and two together," and reported the incident.

Following the report of the incident on the afternoon of February 15, 2002, the victim was interviewed by four different responding law enforcement or medical personnel. Officer Jeanine Sarno of the Metro Police Department was the first official to speak with the victim. Officer Sarno testified that the victim stated that the Defendant "stuck his finger up her butt" the previous night and indicated that he had done "it" before. On cross-examination, Officer Sarno stated she was uncertain whether the victim meant the Defendant had on prior occasions touched her inappropriately, or specifically penetrated her anus before.

Amanda Lewis, a Sex Abuse Investigator with the Child Protective Services Division of the Tennessee Department of Children's Services, testified that she went to the victim's home and met with her one-on-one the afternoon of February 15, 2002. Ms. Lewis testified that the victim informed her that the Defendant had "put his finger in her bootie," and identified the buttocks region. When Ms. Lewis questioned the victim about her reports of pain in her genital region, the victim confirmed that her private part was hurting because the Defendant "placed his finger in that body part, as well." The victim also informed Ms. Lewis that she was wearing panties the previous night. Ms. Lewis further testified that the victim described to her the earlier "hunching" incident, and claimed the Defendant always wanted her to take a bath. Ms. Lewis also observed a more comprehensive forensic interview of the victim conducted in her office approximately three months later in which the victim alleged additional occurrences of inappropriate touching, including the claim that the Defendant licked her genitalia. On cross-examination, Ms. Lewis admitted there were several differences in the nature and number of the alleged sexual contacts between the victim and the Defendant communicated during the victim's various interviews.

The victim was also interviewed that evening at a hospital by Phyllis Thompson, a licenced clinical social worker that specialized in medical and psychological evaluations of children. Ms. Thompson stated that the victim answered her questions at an age-appropriate level, and reported that the Defendant "stuck his finger up her butt." When asked if the Defendant had touched her in any other way, the victim stated that "he stuck his finger in her private part," identifying the genital region on her own body. Ms. Thompson further testified that when she asked the victim if the Defendant had ever touched her like that before, she responded in the negative, but may have meant no other touching that night, since all the conversation had focused on the events of the previous night.

Julie Rosof-Williams testified that she was the nurse practitioner who conducted the medical examination on the victim the evening of February 15, 2002. Ms. Williams was certified by the court as an expert in the field of conducting medical examinations of children with allegations of inappropriate sexual contact. Ms. Williams testified that her examination of the victim's genitalia revealed a "small abrasion on her right labia minora" that was three to four millimeters in length and curved, consistent with a wound made by a fingernail. She also found "bruising on [the victim's] hymen," and "pinpoint bruises around [the victim's] urethra." Ms. Williams described all the

injuries as "acute," or made within twenty-four hours of the examination. Ms. Williams further testified that the injuries required penetration of the labia majora, were consistent with the victim's testimony of genital penetration, and were unlikely to have been self-inflicted.

Detective Ken Potter, with the Youth Services Division of Metro Police, testified that when he responded to the call to Stockell Street on February 15, 2002, he first talked to the victim's grandmother, who made the sex crime allegations against the Defendant. The Defendant was arrested and given his <u>Miranda</u> rights. Detective Potter testified that the Defendant stated he wanted to talk, and proceeded to inform the Detective that he had a good relationship with the victim, and wished he could be her father. The Defendant conveyed his version of the events of the previous night to the Detective by stating he woke up around three or four in the morning and went into the grandmother's room looking for a light for his cigarette, saw the victim, and "popped her one" on the leg. The Defendant then changed his story and said he touched the victim's ear. When questioned about the inconsistency, the Defendant returned to his earlier "leg" version of the story. The Defendant stated, "I know I am going to jail," after being informed by the Detective that the victim was going to be medically examined. When Detective Potter asked the Defendant what he thought the results of the exam of the victim's "private parts" would show, the Defendant responded, "My finger." The Defendant further stated that his middle finger penetrated the victim up to the second knuckle. However, the Defendant also claimed the penetration was an accident. Later, at the police station, the Defendant asked Detective Potter to apologize to the victim and her mother on his behalf, and when asked why, the Defendant stated because "I penetrated my baby." At the conclusion of Detective Potter's testimony, the State rested its case. The State moved to dismiss three of the seven counts, and elected the facts upon which it relied for two counts of child rape and two counts of aggravated sexual battery.

The defense called as its only witness the Defendant, who testified that he had developed a special relationship with the victim's mother, and subsequently the victim and her siblings. The Defendant stated that the night of the incident, he was staying with the victim's family, and he became restless. He first went into the bedroom where the victim was sleeping to get a light for his cigarette. He later decided he wished to leave the house, and returned to the bedroom to wake up the victim so she could lock the door behind him after he left. He stated that he attempted to "pick her up" when she "jumped" and "screamed." He further testified that he grabbed the victim's leg, but did not deliberately touch her in a sexual manner. He explained that any inappropriate contact must have been an accident which occurred when the victim "jerked up, screamed and jerked back down" as he was attempting to wake her.

The Defendant further explained that when he said he "messed up" the morning after the incident, he was referring only to waking the victim up. He said he had previously been scolded for waking the victim too early in the morning, and as a result she was falling asleep in school. The Defendant also claimed that any inconsistencies between his testimony at trial and the statement he gave to Detective Potter the day of the incident were the result of him being "upset" the day of his arrest. The Defendant reiterated that he consistently claimed the penetration in the bedroom was an accident, and denied all the other alleged prior incidents of sexual misconduct.

At the conclusion of the trial, the jury returned a verdict of guilty of child rape under count one relating to the February 15th, 2002, bedroom incident, and guilty of the lesser-included offense of assault with provocative or offensive contact[8] as charged in count five, relating to the earlier "hunching" incident. The jury found the Defendant not guilty of rape of a child as charged in count two, and not guilty of aggravated sexual battery as charged in count four. A sentencing hearing was conducted in August of 2003, at the conclusion of which the Defendant was sentenced as a Range I offender to the "presumptive" mid-rage sentence of twenty years' imprisonment for the rape of a child conviction, and six months for the assault conviction, to be served concurrently. In reaching its sentence, the trial court found one mitigating factor and one enhancement factor applied, reasoned that the two canceled each other out, and imposed the presumptive sentence on the Defendant. The Defendant filed a motion for a new trial, which was subsequently denied by the trial court. The Defendant's late-filed notice of appeal was accepted by this Court in December of 2003.

## ANALYSIS

On appeal, the Defendant raises two issues: (1) the evidence was insufficient to support a conviction of rape of a child considering the State's election to rely on genital penetration to support this count, and (2) the trial court erred in imposing the mid-range sentence on the Defendant due to its application of an inappropriate enhancement factor. We find the Defendant's arguments unpersuasive as to the claim of insufficient evidence, but conclude that the trial court did err in applying the enhancement factor. However, we also find this sentencing error harmless and affirm both the conviction and twenty year sentence.

## I. Insufficient Evidence

The Defendant first challenges the sufficiency of the evidence to support his conviction of rape of a child.[9] The Defendant claims that the evidence presented at trial was insufficient to support the finding that the Defendant penetrated the genitals of the victim as charged in the indictment and specified in the State's election of offenses.[10] We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913,

---

[8] See Tenn. Code Ann. § 39-13-101(a)(3).

[9] The Defendant expressly elected not to challenge on appeal the sufficiency of the evidence supporting his conviction of assault with offensive or provocative contact.

[10] The Defendant does not argue that the evidence failed to support a finding of anal penetration. Rather, the Defendant notes that the State's election of offenses for count one rape of a child, which he was convicted of, specifically referenced only genital penetration.

914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). For the purposes of this statute, sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." Tenn. Code Ann. § 39-13-501(7). When there is evidence in a criminal case that the defendant may have committed more than one sexual offense against the victim, the State must elect the particular offense for which a conviction is sought in order to ensure the jury's verdict is unanimous. See Burlison v. State, 501 S.W.2d 801 (Tenn. 1973). This election requirement has been deemed to be fundamental, immediately touching the constitutional rights of the accused. See id. In cases where there are more instances of criminal behavior proven than there are counts to accommodate them, the State must match specific conduct to a specific count to ensure the jury is unanimous in the conduct upon which the conviction is based. See State v. Hallock, 875 S.W.2d 285, 293 (Tenn. Crim. App. 1993). In this case, the State elected to rely on the testimony of the events which occurred when the victim was in the bed with her grandmother to support the charge of rape of a child in count one of the indictment. In addition, the State specifically stated it was relying on its proof of genital penetration to establish this crime. The trial court's charge to the jury instructed the jury that count one charged the Defendant with penetrating the "genitals" of the victim. Therefore, for the jury to convict the Defendant of rape of a child as specified by the State's election of offense in count one, it had to find that the State proved beyond a reasonable doubt that the victim was under thirteen, and that the Defendant sexually penetrated the victim's genital opening.

The proof in this case was undisputed that the victim was under age thirteen. However, the Defendant contends that the only evidence suggesting he penetrated the genitals of the victim was from an expert witness who merely said the victim's injuries were "consistent" with sexual penetration of the genitals, and two out-of-court statements made by the victim which were

introduced as hearsay exceptions only to corroborate the victim's actual trial testimony. The Defendant argues that the victim's testimony is filled with inconsistencies as to genital penetration. The Defendant admits two counselors and a nurse testified that the victim told them she was genitally penetrated, but stresses that at trial the victim herself testified only to anal penetration. In sum, the Defendant claims the "proof at trial established only anal, but not genital, penetration," and therefore the evidence is insufficient to support the subsequent jury conviction.

On review, the record reveals the Defendant stated to Detective Potter that an examination of the victim's "private parts" would reveal evidence of his finger. Less than twenty-four hours after the incident, the victim informed both Ms. Lewis and Ms. Thompson in separate interviews that the Defendant penetrated both her anus and genitals. Nurse Williams, certified as an expert, testified as to the recent cut on the victim's labia minor and the bruising of her hymen and urethra, all consistent with the victim's testimony of genital penetration. Moreover, we note that our Supreme Court has previously found sufficient evidence to support a conviction of rape of a child despite the fact that the victim's testimony contained some inconsistencies. See State v. Elkins, 102 S.W.3d 578, 582 (Tenn. 2003) (upholding a conviction despite the victim's inconsistent statements and the fact that the victim's own mother denied his testimony).

We conclude the Defendant has failed to meet his burden of demonstrating that the evidence presented at trial was insufficient to support the jury's finding that the victim was genitally penetrated. In pointing to inconsistencies in the victim's testimony, the Defendant is essentially questioning the credibility of witnesses and the weight of the evidence introduced at trial. However, this Court has consistently held that questions as to the credibility of witnesses and the weight and value of evidence are resolved by the trier of fact, and we will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W. 3d at 236; Bland, 958 S.W.2d at 659. Based on all the evidence, viewed in a light most favorable to the State, we conclude that a rational trier of fact could have found the Defendant guilty beyond a reasonable doubt of rape of a child. This issue is without merit.

## II. Sentencing Issue

The Defendant also asserts that the trial court erred when it sentenced him to twenty years' imprisonment. The Defendant argues that the trial court misapplied one enhancement factor and failed to apply a relevant mitigating factor, and therefore the Defendant should have been sentenced to less than the presumptive sentence.[11] We disagree.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-

---

[11]The Defendant argues that it is unclear if the trial court applied the mitigating factor that no serious bodily injury was threatened or resulted from the criminal conduct. See Tenn. Code Ann. § 40-35-113(1). However, it seems clear from the record that this was the only mitigating factor the judge considered and ultimately applied in order to "offset" the enhancement factor it also found applicable.

113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Pike, 978 S.W.2d 904 app. at 926-27 (Tenn. 1998). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

In calculating a sentence for a Class A felony conviction, the presumptive sentence is "the midpoint of the range if there are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-210(c). If there are enhancement, but no mitigating factors, the trial court may set the sentence at or above the midpoint, but still within the range. See Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors for a Class A felony requires the court to start at the midpoint, next assign the proper weight for the enhancement factor, and finally apply a reduction within the range as appropriate for the mitigating factor. See Tenn. Code Ann. § 40-35-210(e). The sentence range for a Range I, Class A felony is "not less than fifteen (15) nor more than twenty-five (25) years." Tenn. Code Ann. § 40-35-112(1). Therefore, the presumptive sentence for a Class A felony conviction of rape of a child is the midpoint, or twenty years.

While not briefed by either the Defendant or the State, we are compelled to address this issue in light of the United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S.Ct. 2531 (2004), reh'g denied, 2004 WL 1872712 (U.S. Wash. Aug 23, 2004). In Blakely, the high court struck down a provision of the Washington state sentencing guidelines, quite similar to the one in Tennessee, that permitted the trial judge to impose an "exceptional sentence" after the court made a post-trial determination that certain statutory enhancement factors existed. The Supreme Court determined that the protections in the Sixth Amendment to the federal Constitution would allow a defendant's sentence to be increased only if the enhancement factors relied upon by

the judge were based on facts reflected in the jury verdict or admitted by the defendant. See id. at 2537. The Court concluded that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id. at 2543.

The Blakely decision calls into question the validity of Tennessee's sentencing statutes, insofar as they permit trial courts to increase a defendant's presumptive sentence based upon enhancement factors found by a trial judge as opposed to findings made by a jury. In this case the Defendant was convicted of a Class A Felony with a sentencing range of fifteen to twenty-five years. He was sentenced as a Range I offender to a presumptive sentence of twenty years. At the sentencing hearing, the trial court found that one enhancement factor applied: the defendant abused a position of trust. See Tenn. Code Ann. § 40-35-114(16). This enhancement factor was not submitted to the jury or admitted by the Defendant. However, the court ultimately offset this enhancement by applying one mitigating factor: that the criminal conduct neither threatened nor resulted in "serious" bodily injury. See Tenn. Code Ann. § 40-35-113(1). The court therefore declared that the "[enhancement] factors and the mitigating factors just sort of offset each other," and sentenced the Defendant to the presumptive midrange sentence of twenty years.

We conclude that Blakely precludes the application of the enhancement factor applied in this case. However, we also conclude that the record does not support a mitigated sentence for the Defendant. The trial court attributed very little weight to the mitigating factor, stating, "[T]here were obviously injuries. It may not have been extremely serious injuries, but there was trauma to this child . . . ." The judge accepted the enhancement factor pertaining to an abuse of trust followed directly by its conclusion that the mitigating and enhancement factors cancelled each other out. Upon reviewing the record of the sentencing court as a whole, we believe it is clear that, even if the court had not considered the enhancement factor, the court would not have reduced the sentence below the presumptive sentence. Accordingly, we find the application of the enhancement factor to be harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 23-24 (1967). We also note that, based on our de novo review of the record, the mitigating factor applied by the trial judge is entitled to little weight, and the presumptive mid-range sentence is appropriate.

## CONCLUSION

For the foregoing reasons we affirm the trial court's judgments as to both the convictions and sentences.

_____
DAVID H. WELLES, JUDGE

-10-